In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3169

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SHAWNA LEANNE SMITH,

Defendant-Appellant.


Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-CR-16-S-01--John C. Shabaz, Chief Judge.


Argued January 21, 2000--Decided July 14, 2000


Before Bauer, Ripple and Kanne, Circuit Judges.

Bauer, Circuit Judge. On January 28, 1999, Defendant Shawna L. Smith ("Smith") was arrested for bank fraud. She confessed within an hour after her arrest. Later, she moved to suppress her confession, but the motion was denied and her confession was used against her at trial. A jury found her guilty of six counts of bank fraud in violation of 18 U.S.C. sec. 1344 and one count of using a false social security number in violation of 42 U.S.C. sec. 408(7)(B). The United States District Court for the Western District of Wisconsin sentenced Smith to 30 months imprisonment and ordered restitution in the amount of $202,474.05. She appeals, claiming that the District Court erred in denying her motion to suppress because she did not knowingly and voluntarily waive her Miranda rights and because her statements to the authorities were not voluntary. She also challenges the District Court's inclusion of the dollar amounts she charged on stolen credit cards and the dollar amounts she attempted to obtain from advances on the cards in computing the loss amount for sentencing and restitution purposes./1 We affirm.

I. BACKGROUND

In the summer of 1998, Shawna L. Smith left California and came to Wisconsin to participate

in a bank fraud scheme. The mastermind behind the scheme, "Nepa," paired Smith with a Nigerian named Rasheed Ukaonu ("Ukaonu"). The plan was simple. Using stolen credit cards and corresponding counterfeit drivers' licenses provided by Nepa, Smith obtained mailing addresses at two different "Mailboxes, Etc." locations in Madison. Then, using five business checks that had been stolen from the mail, Smith went to five different area banks and opened one business checking account at each bank. Each account was opened in the business name of a payee of one of the stolen checks and listed as its address one of the two "Mailbox, Etc." addresses. For identification, Smith provided the banks with a false driver's license, and on one occasion, the corresponding stolen credit card. She then made a small initial cash deposit into each account.

A few days later, Smith deposited one of the stolen business checks into each corresponding account. She waited a few days for the checks to clear and then withdrew most of the available funds in the form of cash and cashier's checks, each check made payable to one of her aliases. She then quickly (usually the same day) cashed the cashier's checks at a branch location of the victim bank. To cash each of the cashier's checks, Smith posed as the payee. She showed a counterfeit driver's license, and, sometimes, the underlying credit card, for identification.

The credit cards were used for more than identification at the banks. Smith also used them to obtain almost $30,000 in unauthorized cash advances at the same banks. She charged a rental car to one of the cards, and charged $5,000 worth of gas, food, and liquor to others. The indictment against Smith originally charged her with intent to defraud using unauthorized credit cards and obtaining over $1,000 in cash advances and goods, in violation of 18 U.S.C. sec.1029(a)(2), but that count was dismissed by the Government without prejudice prior to trial.

A criminal complaint charging bank fraud was issued by the United States District Court for the Western District of Wisconsin on January 28, 1999 and Smith was arrested later that night at her last known address, a YMCA in Hollywood, California. The arrest was made by four plain clothes FBI agents and one postal inspector at 9:45 pm. Smith did not resist.

Smith was taken to the U.S. Postal Service Office in Los Angeles for questioning. The agents began by reading Smith her rights off of a standardized form. She was then given the form to read, which she appeared to do. The agents asked

Smith if she understood her rights and Smith indicated that she did, either verbally or with an affirmative nod of her head. One of the agents then asked Smith to sign the waiver of rights form. Smith refused. But, when the agents asked whether she wanted to talk to them and whether they could ask her questions, Smith said "yes." Thereafter, the agents questioned Smith for about one hour, during which time she admitted her involvement in the fraud scheme. Smith never asked that the questioning be halted or that she be provided with an attorney. Smith was subsequently indicted on six counts of bank fraud, one count of credit card fraud and one count of using a false social security number.

Prior to trial, Smith moved to suppress her confession, claiming that she did not waive her Miranda rights and that because of the coercive and intimidating atmosphere during her interrogation, her statements to the agents were not voluntary. An evidentiary hearing was held before the Magistrate Judge and he recommended that the motion be denied. The District Judge adopted the Magistrate's recommendation and denied Smith's motion to suppress.

After a two day trial, a federal jury found Smith guilty on the remaining counts of bank fraud and using a false social security number. The Presentence Report recommended that the purchases on the stolen credit cards be included for purposes of offense level computation and for purposes of computing restitution. It calculated the amount at $40,320.76. Smith objected to the inclusion of that amount since the charge of credit card fraud against her had been dropped.

At the sentencing hearing, under U.S.S.G. sec.2F1.1(b)(1), the court calculated the undisputed losses from the bank fraud at $167,418.25. It also added attempted credit card transactions producing no loss in the amount of $9,800 and actual credit card losses of $35,055.80, for a total loss of $212,274.05. By including the credit card losses in the computation, Smith's base offense level was 14, instead of 13. The court also added a two level enhancement under U.S.S.G. sec.3C1.1 for obstruction of justice for Smith's false testimony at the suppression hearing and denied any downward departure under U.S.S.G. sec.3B1.2 for Smith's claim that she was only a minor participant in the scheme. Sentence was imposed at 30 months, and restitution was ordered at $202,474.05. Judgment was entered accordingly.

II. DISCUSSION

A. Motion to Suppress

The two issues before us regarding Smith's motion to suppress are whether Smith knowingly and voluntarily waived her right against self-incrimination and whether Smith's post-arrest statements to the agents were voluntary. This Court reviews the question of whether Smith's waiver of her Fifth Amendment Miranda rights was voluntary de novo. United States v. Mills, 122 F.3d 346, 350 (7th Cir. 1997), cert. denied, 522 U.S. 1033 (1997). We also review de novo Smith's claim that her inculpatory statements to the authorities were involuntary. United States v. Dillon, 150 F.3d 754, 757 (7th Cir. 1998). Both questions are considered under the totality of the circumstances. United States v. Brooks, 125 F.3d 484, 490-92 (7th Cir. 1997).

As the Government properly states in its brief, Smith's motion to suppress presents "a factual dispute," a veritable "she said" versus "they said." The District Court ruled against Smith after hearing evidence, saying Smith's testimony was "totally unbelievable." We must give deference to the District Court's findings of fact, Mills, 122 F.3d at 350-51, and credibility determinations, United States v. Jensen, 169 F.3d 1044, 1046 (7th Cir. 1999).

Smith's arguments here are the same as those raised below. She claims that her waiver was not valid and her statements not voluntary because she was handcuffed to her chair, under the influence of cocaine and sleeping pills, tired, menstruating, ill, intimidated and not allowed to use the bathroom until after she confessed. Weighed against contrasting evidence presented by the government agents, Smith's attempts to shed her confession fail.

The government agents testified, and the District Court found, that Smith's rights were read to her in a slow, deliberate and understandable manner and that Smith was given the printed form to read, which she appeared to do. When asked whether she understood her rights, Smith indicated that she did. She then refused to sign a waiver form, but went on to confess anyway.

Smith argues that she did not waive her Fifth Amendment right against self-incrimination and that her avowal should be suppressed because she refused to sign the waiver of rights form when it was presented to her. However, a Miranda waiver need not be express. It may be inferred from a defendant's understanding of her rights coupled with a course of conduct reflecting her desire to give up her right to remain silent. North Carolina v. Butler, 441 U.S. 369, 373-76 (1979).

Indeed, waiver may be inferred from the defendant's conduct, even when she has refused to sign a waiver form. United States v. Banks, 78 F.3d 1190, 1196-98 (7th Cir. 1996), vacated on other grounds, 519 U.S. 990 (1996), on remand, United States v. Mills, 122 F.3d 346 (1997), cert. denied 522 U.S. 1033 (1997).

Here, there can be no doubt that Smith's conduct demonstrated a waiver of her right to remain silent. She immediately began talking to the agents after refusing to sign the waiver form and continued to do so for an hour. During that entire time, she never requested an attorney and never asked that the questioning be stopped. There can be no credible argument under these facts that Smith's conduct was not a waiver of her Miranda rights.

Smith claims alternatively that her confession was the product of the agents' overbearing tactics. The agents dispute that the atmosphere during Smith's interrogation was intimidating or coercive. They said that at the outset they offered Smith a soda. She refused it, but asked for a glass of water, which was immediately brought to her. They maintain that they sat a respectful distance from her, they did not gang up on her, and that most of the questioning was done by one agent, although occasionally the other agents would ask clarifying or follow-up questions. As to her claim that she was not allowed to use the bathroom until after she confessed, the agents said that Smith did not ask to use the restroom until the end of the interview and that her request was immediately granted. The District Court believed the agents' testimony and found that, contrary to Smith's description, the atmosphere was "low key and informal." Thus, it seems to us, that despite "striv[ing] mightly", in the words of the Magistrate Judge, to convince the court that the agents' tactics overbore her will and forced her into talking, Smith's statements were voluntary and properly used against her at trial.

Nor are we persuaded that Smith was incapacitated by having ingested cocaine and over-the-counter sleeping pills 45 minutes prior to her arrest. Smith did not tell the agents that she had taken drugs, did not appear to the agents to be under the influence of any drugs, and responded appropriately to the agents' questions, hardly the conduct expected of a woman who was mentally disabled and unable to make knowing choices. Most damaging to her claim, though, is the fact that she refused to sign the waiver form. Smith's refusal to do so shows her independent thinking and exercise of her free will. Her claim thus fails.

The question before us is whether Smith was too high on crack, too sleepy, feeling too unwell because she was menstruating and too intimidated to be mentally capable of executing a knowing and intelligent waiver of her Miranda rights. The District Court had no hesitation in finding that Smith's excuses were "totally unbelievable" and that the Government's description of events was more credible. We defer to the District Court's thorough and specific findings, especially since they are amply supported by the evidence. We thus affirm the denial of Smith's motion to suppress her confession.

B.   Sentencing Issues

At sentencing, the District Court found Smith's total offense level to be 18. A base offense level of six was applied because Smith's crime involved fraud or deceit. U.S.S.G. sec.2F1.1(2). Eight levels were added because the amount was more than $200,000. U.S.S.G.sec.2F1.1(b)(1)(I). Additional levels were then added because Smith was found by the court to have obstructed justice by testifying falsely during the suppression hearing and because the crime involved more than minimal planning. Had the court not included the credit card losses, the amount would have been less than $200,000 and Smith's offense level would have been one point lower. U.S.S.G. sec.2F1.1(b)(1)(H). Smith argues that the District Court erred in including the credit card charges in the loss amount. She contends that those losses cannot be included because they relate to crimes for which she was neither charged nor convicted and because the court did not make the requisite findings that the credit card fraud was conduct relevant to the bank fraud scheme.

We review the District Court's factual determinations for clear error, but its interpretations of the sentencing guidelines de novo. United States v. Petty, 132 F.3d 373, 380 (7th Cir. 1997); United States v. Edwards, 115 F.3d 1322, 1325 (7th Cir. 1997). A finding that uncharged activity is "relevant conduct" that can be considered under the sentencing guidelines is a finding of fact that we will not disturb unless it is clearly erroneous. United States v. Sykes, 7 F.3d 1331, 1335 (7th Cir. 1993). Applying these standards to the questions before us we find that the District Court correctly applied the sentencing guidelines to findings of fact that were not clearly erroneous and we thus affirm Smith's sentence.

Smith's first argument, that the losses and the

attempted losses from the credit cards cannot be attributed to her for sentencing purposes because they relate to uncharged conduct and conduct for which she was not convicted, is easily disposed of. "[S]entencing judges may look to the conduct surrounding the offense of conviction in fashioning an appropriate sentence, regardless of whether the defendant was ever charged with or convicted of that conduct, and regardless of whether he could be." United States v. Dawn, 129 F.3d 878, 884 (7th Cir. 1997). See also United States v. Meyer, 157 F.3d 1067, 1081-82 (7th Cir. 1998), cert. denied 119 S.Ct. 1465 (1999). To avoid the obvious rejection of her argument on this basis, Smith rephrases it as an argument that the credit card losses do not "square with" the indictment, which charges bank fraud. We do not, however, believe this change in verbiage changes the result. Her attempt to limit the "relevant conduct" to conduct outlined in the indictment is exactly the same argument considered and rejected by this Court in Meyer and Dawn. We see no reason to depart from those holdings here.

Smith's other argument, that the credit card fraud cannot be included in the loss calculation because it was not part of a "common scheme or plan" or part of the "same course of conduct," is more substantial. "The [s]entencing [g]uidelines specifically contemplate, indeed require, that the district courts take into account the full range of related conduct, whether it be charged or not." United States v. Petty, 132 F.3d 373, 381 (7th Cir. 1997) (citation and internal quotation marks omitted). "Related conduct" is described by the guidelines as all acts or omissions by the defendant (1) which occur during the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or (2) are part of the "same course of conduct or common scheme or plan" as the offense of conviction. U.S.S.G. sec.1B1.3(a)(1).

[B]ecause the relevant conduct rule is "not without limits" and "because its application so favors the government," we insist that courts be "scrupulous to ensure that the government has adhered to those limits." One of the ways in which we ensure that these limits are maintained is by requiring sentencing courts to "explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, the finding that the unconvicted activities bore the necessary relation to the convicted offense." United States v. Beler, 20 F.3d 1428, 1431-32 (7th Cir. 1994), citing United States v. Duarte, 950 F.2d 1255, 1263 (7th Cir. 1991).

United States v. Crockett, 82 F.3d 722, 729 (7th Cir. 1996).

Not only does Smith claim that the credit card fraud was not conduct relevant to the bank fraud scheme for sentencing and restitution purposes, she claims that the District Court did not follow our mandate that it make explicit findings that the credit card scheme was part of a "common scheme or plan" or "part of the same course of conduct" (as those terms are defined by Application Note 9 to U.S.S.G. sec.1B1.3) as the bank fraud scheme, and thus the credit card losses cannot be counted. We agree that the sentencing judge did not spend a great deal of time developing this connection, and we would wish all judges to be very explicit and detailed, but we do not agree with Smith that no findings were made by the court here. The judge noted that the credit cards which were wrongfully used were in the same names as the aliases used by Smith and that there were some photos by bank surveillance cameras showing that it was Smith attempting to obtain cash with those cards. The judge found that the charges and advances were made during the same thirteen day period in which the defendant was defrauding the banks and that the transactions were the same "MO" as that used by Smith during the bank scheme. As we have said, these findings may be bare bones and perhaps more could have been done by the court to set forth its reasoning as clearly as possible, but the fact that more could have been said does not compel us to vacate Smith's sentence. Deficiencies in the District Court's statements that are harmless do not require a vacation of the sentence. Crockett, 82 F.3d at 730.

In Crockett, the defendant was convicted on drug conspiracy charges. At sentencing, the judge calculated the quantity of drugs by including one transaction that occurred after the scope of the charged conspiracy. He justified the inclusion by saying it was "related conduct," and supported that by saying only that all of the conduct involved "dealing in the field of controlled substances," all of which were close in time and involved the same accomplices. We found that minimal effort to be harmless error because it was backed up by the objective evidence and did not change the defendant's base offense level.

We have, in other cases, also found that a pacuity of explicit findings by the sentencing judge does not mandate the vacation of the defendant's sentence. See e.g., Petty, 132 F.3d 373. There, we held that because the District Court found a common purpose of financial gain, similar modus operandi and common accomplices,

that was enough to satisfy our requirement of explicit findings. Id. at 381. The District Court made similar findings here. Because they are backed up by the objective evidence, we affirm the inclusion of the credit card losses and affirm Smith's sentence.

The fact that it was ultimately the credit card companies and not the banks that suffered the losses occasioned by the wrongful use of the credit cards does not mean, as Smith suggests, that the District Court could not order restitution for those losses. Restitution can include all victims of the scheme. United States v. Bennett, 943 F.2d 738, 740 (7th Cir. 1991), cert. denied, 504 U.S. 987 (1992). Smith contends that she can only be compelled to compensate the banks because that is the only fraud scheme with which she was charged and convicted. Again, we reject that notion. As long as the court can adequately demarcate the scheme, it can order restitution for any victim harmed by the defendant's conduct during the course of that scheme. United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996). Not only did the District Court conclude that the credit card fraud was part of the same scheme or course of conduct as the bank fraud scheme, our review of the evidence convinces us that this is true. Smith used the credit cards to rent the car used to drive herself and her accomplice to and from the various banks, she used the credit cards as identification to open some of the accounts, and she used them as identification to cash some of the cashier's checks. Also, all of the purchases and cash advances on the cards were made in the Madison area, the same location as the bank fraud. Given all of this, we are convinced that the schemes were so intertwined, that the credit card scheme was used to support the bank fraud scheme, that restitution is appropriate. The order of restitution including the credit card losses is thus affirmed.

III.  CONCLUSION

For the foregoing reasons, the judgment of the District Court is affirmed.

AFFIRMED.


/1 Smith also raises as claims of error the District Court's failure to give a requested jury instruction, addition of a two level enhancement at sentencing for obstruction of justice and refusal to grant a downward departure for being only a minimal participant in the fraud scheme. We believe these contentions to be wholly without merit and do not address them in our opinion.