**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Edward J. CONLEY,**
**Defendant-Appellant.**

**No. 86–2644.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1987.

Decided July 29, 1987.

Rehearing Denied Sept. 3, 1987.

---

Joseph A. Lamendella, Lamendella & Daniel, Chicago, Ill., for defendant-appellant.

Laurie N. Feldman, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD, COFFEY and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The defendant, Edward J. Conley, a personal injury lawyer, was convicted by jury in July 1986 on three counts of willful attempt to evade and defeat the payment of his personal income tax, in violation of 26 U.S.C. § 7201.[1] The defendant was charged with concealing and attempting to conceal the nature, extent, and ownership of his assets by placing his assets, funds, and other property in the names of others and by transacting his personal business in cash to avoid creating a financial record. The defendant was charged in Count I with a deficiency of approximately $71,397 for the year 1979; in Count II, for the year 1980, a deficiency of approximately $45,-987, and in Count III, for 1981, a deficiency of $11,622.[2]

The defendant raises four issues: (1) whether the evidence was sufficient to show the affirmative acts of evasion charged; (2) whether the proof of evasive acts occurring throughout the year was at fatal variance with the allegations that evasive acts occurred "on or about April 15" of the years involved; (3) whether various items of evidence were properly admitted into evidence, and (4) whether certain instructions were appropriate.

## I. FACTUAL BACKGROUND

As a self-employed personal injury lawyer the defendant did well, but he was less than enthusiastic about sharing his money with the government. From 1966 through 1981, he assessed his own tax debt at $241,-657.13, but during that period he paid less than $7,000 on time. He totally ignored the requirement that he make quarterly estimated income tax payments. Each year the defendant received a deficiency notice on the joint returns he filed with his wife, but the deficiencies, together with added interest and penalties, failed to sufficiently impress him with his tax obligations. We will examine in more detail the latter four years of that period.

In early 1978, the IRS filed a tax lien in Will County in the total amount of $32,-278.97 owed by defendant for the years 1974, 1975, and 1976. When April 15, 1978, arrived, the defendant neither filed his return nor paid the prior year's taxes. Three days later, however, defendant and his wife created a land trust of their house and acreage, property which they had previously held in joint tenancy. The Chicago Title and Trust Company was trustee, defend-

---

1. 26 U.S.C. § 7201 provides for two offenses, the more common being to evade or defeat any tax, and the offense charged in this case, to evade or defeat the payment thereof.

 Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

2. The trial judge imposed a period of imprisonment of one year and one day on Count I, and sentenced defendant on each of Counts II and III to concurrent three-year periods of probation, to run consecutively to the sentence on Count I. As a condition of probation the defendant was required to pay all back taxes and penalties. The judge also imposed fines in the amount of $10,000 on each count.

ant's wife was named beneficiary, and the defendant was the contingent beneficiary. On May 1, 1978, the defendant paid what he owed for 1974, but he failed to satisfy the other deficiencies.

In early 1979, the IRS began to pay more attention to the defendant. In January, an IRS agent made a house call on the defendant to collect back taxes. Finding no one at home, the agent left his calling card. In February, the IRS filed more liens in Will and Cook counties. The day after the liens were filed, the defendant left for a trip to Florida. About a week later, the IRS served a notice of levy and a summons on the trustee for the property held in the land trust. After learning of this action from the trustee, the defendant paid $6,000 on his 1976 taxes. Also in February, the IRS served a levy on the American National Bank where defendant maintained three accounts: a Client Fund account, the funds of which, according to the defendant, belonged to his clients; an Attorney-at-Law account in his own name; and an R.C. Stables account for which he and his son, Terrence J. Conley, were signatories. The defendant was not listed as an owner of the stables account. Nevertheless, the defendant used this stables account to pay some business and personal expenses, including the expenses for his horse-racing activities. His son maintained a separate account at American National Bank.

After the bank received notice of the IRS's levy, it segregated the funds in the defendant's Attorney-at-Law account. The bank did not, however, segregate the funds in the defendant's Client Fund account because those funds did not appear to belong to the defendant, but to his clients. The bank gave the defendant notice of its actions, and the defendant responded within a week by opening a new account at the Chicago Tokyo Bank in the name of his son, Terrence. This account was funded by $2,000 cash and a $2,000 check drawn on defendant's Client Fund account. Terrence did not contribute to this account. With the exception of one check drawn by his son, the defendant used this account for his personal and business expenses.

On March 17, 1979, the defendant traveled to Seattle, Washington. On or about April 15, 1979, the defendant filed a tax return for 1978, but failed to enclose any payment.

Although the defendant had had an interest in horse racing for several years, within a week of failing to pay his 1978 taxes he transferred the horses he had owned and raced in 1977 and 1978 to his sons. From then through 1982, the defendant raced and claimed[3] horses in his sons' names. His son Terrence claimed two horses in 1979, Committee Doll for $4,000 and Smithton Road for $2,500.[4] Checks drawn on the account never named defendant as payee, but were endorsed to him and then cashed. The defendant's sons showed no horse income or expenses on their returns for 1979–1981. When the defendant's son Timothy was later audited, the defendant submitted an affidavit stating that the horses were actually his although nominally owned by Timothy. At trial the defendant admitted that any horse-racing proceeds were his.

In June of 1979, the IRS filed tax liens for defendant's 1978 taxes. Another agent visited his home, and again left a calling card when she found no one at home. Shortly thereafter, the agent served a notice of seizure and levy on the defendant's trust assets for the taxes due for 1975, 1976, and 1978. The total amount due was $57,221.31. A notice for sealed bids appeared in the Chicago Tribune, prompting the defendant to pay in full the amount due

---

**3.** A claiming race is a horse-racing procedure which requires a horse owner wishing to enter a race for an attractive purse to risk losing the horse to another person willing to pay the stated claiming price. It is considered a way to keep owners honest and to increase competition. Claiming races are not a new concept as something similar dates back to the 17th century in England. Today it is estimated that over seventy percent of all races run in the United States are claiming races. *See* T. Biracree & W. Insinger, *The Complete Book of Thoroughbred Horse Racing* 217–22 (1982).

**4.** One year earlier the defendant had claimed a race horse with the dubious name of Dumpling for $2,500.

for those years. The 1977 tax year for some reason had not been included.

In August 1979 the defendant filed the 1977 return, but without enclosing payment. The IRS again filed liens. In October, the defendant and his wife left for a trip to England and France, and IRS seized the assets in the defendant's law office. When defendant understood that he would be locked out of his office and its contents sold, he promptly paid the amount then due in full, approximately $18,000.

For 1979 the defendant admitted over $200,000 gross income. Using its standard procedures, the IRS estimated that the defendant cashed checks payable to him, usually at a currency exchange, for about $104,000, without making any deposit. In that year defendant also spent over $12,000 purchasing horses. When he filed his return he deducted over $30,000 for horseracing expenses. Defendant managed to make timely payments on installment loans for a Buick and a Cadillac and some other items including his mortgage, making some of the payments in cash.

In 1980, the defendant timely filed his 1979 tax return showing a tax due of $79,789, but, as was his habit, he made no payment. In April of 1980, the defendant opened a brokerage account at Paine Webber. He traded in risky stocks for about a year, investing over $30,000, but he suffered a net loss. Also in April, the defendant's house was taken out of trust and conveyed to the defendant's three children as joint tenants. The defendant's wife signed the order to the trustee directing the conveyance with a notation that it was to be rushed as it would soon be picked up by the defendant. The order had been notarized in the defendant's office. The defendant and his wife continued to live in the home, make the mortgage payments, and deduct the payments on their tax return. The defendant later admitted the transfer was to avoid seizure by IRS.

In May of 1980, the IRS levied on a personal account the defendant maintained at the Matteson-Richton Bank which he sometimes used for personal expenses. The IRS likewise levied on the Attorney-at-Law account at the American National Bank, but, again, not the Client Fund account because the money was apparently the defendant's clients', not his own. After this levy, the defendant stopped using the Attorney-at-Law account and began drawing for personal and business purposes on the Client Fund account as if it were his own. He continued his racing and claiming in the name of one of his sons, but admitted that his racing expenses exceeded $40,000. The defendant's total 1980 gross income, according to defendant's figures, was $131,000, about half of it estimated by the IRS to have been received in cash. The defendant began making even his mortgage payments in cash.

The defendant ushered in 1981 by opening an account with Charles Schwab & Co. During the year he invested about $12,000 in that account as well as about $2,500 in his PaineWebber account. He financed his Schwab investments with checks on the Chicago Tokyo account held in his son's name, or with checks drawn on his Client Fund account. The defendant timely filed his 1980 tax return, but again made no payment on his self-calculated obligation of $53,845.46. He later paid $7,500 on what he owed for 1979. The IRS responded with a lien for the 1980 taxes. The IRS estimated that in 1981 the defendant received approximately $127,055 in cash.

In January of 1982, the defendant traveled to Alabama. In February and March, the IRS filed liens in Cook County for taxes the defendant owed for 1979 and 1980. The defendant timely filed his 1981 return showing a tax due of $81,729, and must have caused some surprise at IRS by enclosing a down payment of $3,900.

In April of 1983, two special agents, Hagan and Doukas, met with defendant in his law office to discuss his 1977–1981 taxes. The defendant could not explain why he did not pay his taxes. Whatever his reasons may have been for postponing payment, the defendant has now accumulated interest and penalties as well as a prison term and a fine.

At trial the defendant was his only witness. He denied that he created the land

trust in an attempt to hide his house from the IRS, and he denied any responsibility for the later transfer by his wife to their children. He explained his personal use of the Client Fund account saying that his share of his clients' insurance settlements were deposited in the account. He had not viewed his stock investments as risky. He explained that he transferred his horse-racing activities to his sons because he had no time for the horses, although in 1983, after meeting with IRS agents, he reclaimed his horse-racing interests. His practice of cashing clients' checks which IRS had noticed he explained was a service to clients without bank accounts. He had various other explanations for the ways he handled his financial affairs.

## II. THE ISSUES

The standard for reviewing the sufficiency of the evidence to support a conviction is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also United States v. Perlaza,* 818 F.2d 1354, 1358 (7th Cir. 1987); *United States v. Draiman,* 784 F.2d 248, 251 (7th Cir.1986).

The defendant claims that the government's evidence showed only that he defaulted in his payment of taxes, not that he criminally attempted to evade their payment. He correctly points out that the government did not attempt to show that his returns were erroneous or fraudulent. The guilty verdict, he argues, is the product of an accumulation of errors and a "knee jerk" reaction by the jury to a lawyer who reported a gross income of $1,030,-000 for the period, owed $135,000 in taxes, lived in a nice house, drove a Buick and a Cadillac, owned race horses and traveled throughout the United States and Europe for recreation. Those aspects of the defendant's life were obviously part of the picture considered by the jury, but rightly so.

The statute under which the defendant was convicted requires proof of three elements: (1) willfulness, (2) existence of a tax deficiency, and (3) an affirmative act constituting an attempt to evade or defeat payment of the tax. *Sansone v. United States,* 380 U.S. 343, 351, 85 S.Ct. 1004, 1010, 13 L.Ed.2d 882 (1965); *United States v. Foster,* 789 F.2d 457, 459 (7th Cir.1986); 26 U.S.C. § 7201. The defendant argues that the jury was presented only with evidence of the defendant's default in his payment of taxes, which defendant asserts is not a crime. In *Spies v. United States,* 317 U.S. 492, 498, 63 S.Ct. 364, 367–68, 87 L.Ed. 418 (1943), the Supreme Court distinguished between a willful failure to pay tax when due, a misdemeanor, and a willful attempt to defeat and evade a tax, a felony. The Court determined that the difference lay in the word "attempt," which implies some affirmative action beyond mere nonpayment of tax. "Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony." *Id.* at 499, 63 S.Ct. at 368. Although the defendant admits the tax deficiency, he denies that he committed any willful, affirmative act of evasion. In his view he is being imprisoned merely for debt. We find, however, that there is sufficient evidence in the record that could lead a rational trier of fact, upon learning of the way the defendant handled his financial affairs, to find at least one affirmative act of evasion for each of the years charged in the three counts.

Defendant had more than ample notice that the IRS was attempting to collect what he owed, and as a lawyer, he should have required little notice. He transferred away the title to his house in order to protect it from the IRS. Two IRS agents testified that the defendant admitted he undertook his title transfers for the purpose of shielding the house from the IRS, although at trial the defendant denied making the statement. His house maneuvers began ten days after he failed to pay his

1979 taxes and were rushed to completion by the defendant's law office. He manipulated his bank accounts in various ways, turning finally to his Client Fund account because of its protected status, a status he then violated. He also used his son's name on a bank account he opened for his own personal use, and attempted to separate himself from his horse business, although after IRS inquiry he decided that was not a good idea because he was getting his sons in IRS trouble. During the years in issue the defendant used cash for expense payments and avoided a personal bank account. He also moved his brokerage accounts around. Defendant's financial transactions usually increased in number around April of each year.

The defendant also argues truthfully that the jury was presented with no evidence of defendant's willful failure to disclose his tax liability. The charge against the defendant, however, was that he willfully attempted to avoid paying what he did disclose, a separate offense. There is a distinction between willfully attempting to evade the *assessment* of the tax and willfully attempting to evade or defeat the *payment* of the tax. *Sansone v. United States*, 380 U.S. 343, 354, 85 S.Ct. 1004, 1011–12, 13 L.Ed.2d 882 (1965). We have accepted the defendant's invitation to compare his conduct with that of the defendants in several other cases.

In *Cohen v. United States*, 297 F.2d 760 (9th Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1029, 8 L.Ed.2d 84 (1962), the defendant previously had been convicted of tax evasion, and the Ninth Circuit was reviewing his conviction for willfully attempting to evade the payment of his taxes. The defendant here seems to argue that because his conduct was not as egregious as that of Cohen, he should not be convicted of the same crime. *Cohen*, however, does not set a minimum level of wrongful conduct below which one may not be convicted of willful attempt to evade payment of taxes. Although Cohen was in considerably more trouble than the defendant here, there are similarities in the evidence presented in each case. There was evidence in *Cohen* that Cohen had

placed his assets in the name of others, deposited them with others, dealt in currency, caused his obligations to be paid through and in the name of others, caused moneys paid to him to be paid through and in the name of others, and paid creditors but not the government, all for the purpose of defeating the payment of his income tax liabilities.

297 F.2d at 762. The jury here was presented with evidence that the defendant engaged in some of these kinds of conduct. The government offered evidence that the defendant placed his assets in his sons' names, deposited his assets with others, dealt in currency, and paid creditors but not the government. The defendant may have used fewer means to violate 26 U.S.C. § 7201 than did Cohen, but he nevertheless violated the statute.

In *United States v. Mesheski*, 286 F.2d 345 (7th Cir.1961), this court reversed the conviction of a tax preparer who converted the tax payments of his clients to his own use and then failed to pay his taxes on what he had embezzled from his clients. Although what Mesheski did to his clients was not passive, as far as his own tax obligations were concerned, the evidence disclosed nothing but mere passive failure to pay. We held that there "must be something more, some affirmative positive act to attempt to defeat or evade the tax." 286 F.2d at 346. The defendant here, as is evident from his course of dealings with his assets and his taxes, performed the necessary positive acts. Because Mesheski's real crime was embezzlement, rather than tax evasion, *Mesheski* has little relevance to the defendant's situation.

In *United States v. Trownsell*, 367 F.2d 815 (7th Cir.1966), the defendant previously had been convicted of tax evasion. When it came time to pay, he liquidated his assets and deposited the proceeds in Switzerland. Although the defendant here did not remove his assets so completely, he similarly attempted to place them beyond the government's reach in violation of 26 U.S.C. § 7201. *Trownsell* was a simple case, and of no assistance to defendant

who attempted, although less efficiently, to accomplish the same result.

In *United States v. Voorhies*, 658 F.2d 710 (9th Cir.1981), the defendant failed to file any returns, and, like Trownsell, made use of Swiss banks to avoid tax payment. The court ruled that "[i]ndependent of Voorhies' failure to file 1970 and 1972 personal returns and to pay the corresponding taxes due and owing, the evidence is sufficient to support his conviction for the willful attempt to evade the payment of those taxes." *Id.* at 715. That evidence showed, among other things, that Voorhies liquidated his business assets, exchanging the proceeds for small-denomination cashier's checks, coins, and platinum, and made several trips out of the country to negotiate the checks and deposit the coins and platinum. Voorhies undertook these travels following an IRS audit that put him on notice of tentative tax deficiencies of over $33,000. Again, although the defendant here used different means of attempting to conceal his assets, he attempted to reach the same result, and his conduct is similarly culpable.

The defendant in *United States v. Hook*, 781 F.2d 1166 (6th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986), filed timely and accurate tax returns, as the defendant in this case generally did, and, like the defendant, paid only a fraction of the amount of taxes due. The IRS found it difficult to locate Hook's assets, because he transacted most of his business in cash, or used others' credit cards. He also bought a house in his girlfriend's name. Hook argued that 26 U.S.C. § 7201 did "not encompass conduct which goes solely to concealing assets," but, instead, applied only "if the taxpayer also files a fraudulent return or otherwise attempts to conceal the existence or amount of taxable income." *Id.* at 1169. The Sixth Circuit, citing *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943), concluded that Hook's argument was contrary to the language of 26 U.S.C. § 7201 and the Supreme Court's interpretation thereof. To the extent the defendant here has tried to press the same argument, insisting that he has been hon-

est with the IRS in filing accurate returns, the holding in *Hook*, with which we agree, demonstrates that the filing of accurate returns does not exonerate the defendant's attempts to then evade the actual payment of his taxes by concealing his assets.

It cannot be expected that all tax payment evaders approach their problem in the same way. They have demonstrated a certain misguided freedom to use their own devices as they deem best to suit their own circumstances. Although the defendants in the cases we have reviewed used some different methods of attempting to conceal their assets than did the defendant here, the cases are not distinguishable on that ground. The statute does not require any similarity or pattern, and specifically prohibits attempts to evade or defeat tax "in any manner." The Supreme Court in *Spies*, 317 U.S. at 499, 63 S.Ct. at 368, specifically declined to define or limit the congressional use of the phrase "in any manner" lest it constrict its scope.

Defendant makes an effort to explain the way he handled the title to his house, his bank accounts, horses, cash transactions, and other aspects of the government's case, and points out things done by other tax payment evaders that he did not do. The defendant, however, failed to convince the jury, and after reviewing this record that failure is understandable.

■ The defendant also argues that the government failed to prove the charges in the indictment which alleged that on or about April 15 in each of the years involved the defendant acted in an attempt to evade tax payment. The defendant argues that the government thus failed to prove beyond a reasonable doubt an essential element of the crime charged, citing *United States v. Francesco*, 725 F.2d 817, 821 (1st Cir.1984), a narcotics case. It is accepted that the government must sustain its burden of proof of each element of the crime, *In re Winship*, 397 U.S. 358, 363–65, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). In this case, however, it was not necessary for the government to prove that all the acts of the defendant to evade payment

occurred each of the years on April 15, although the evidence shows a concentration of evasive action around April 15, the date defendant's taxes were due, but not paid. That date each year seems to have reminded defendant that it was time not to pay but to do something to avoid payment. It was also necessary during other times of the year for the defendant to follow up on his other willful nonpayment plans for that year's taxes. Whether actually occurring in April or not, the defendant's activities were all related and directed toward his annual ritual of avoiding payment of his tax for that particular year.

In *United States v. Galiffa*, 734 F.2d 306, 312 (7th Cir.1984), this court examined the various criteria by which an indictment is to be measured, as set forth by the Supreme Court in *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). The indictment in this case was more than sufficient to inform the defendant of the offense with which he was charged, and he presented a defense, although unsuccessfully. Nothing in the record suggests that the defendant had the slightest doubt what the case against him was about.

The defendant concedes that some of the alleged evidentiary and jury instruction errors he now raises on appeal would not by themselves amount to reversible error, but argues that cumulatively they constitute plain error under Federal Rule of Criminal Procedure 52(b).[5] The defendant failed to object at trial to most of these alleged errors. *United States v. Young*, 470 U.S. 1, 15–16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985); *United States v. Hill*, 332 F.2d 105, 107 (7th Cir.1964).

■ The defendant argues first that certain items of financial evidence were erroneously admitted to his prejudice. This evidence included, among other things, his brokerage accounts, his trips around the United States and to Europe, his purchase of a riding mower, and the fact that he owned a Cadillac. It does not appear, however, in viewing the evidence as a whole, that the government tried to convert a "collection case" or a "failure to pay case" into a felony. The evidence tended to show that the defendant had the means to pay his taxes, indicating that his failure to pay was for other reasons. The government argued that the defendant simply wished to maintain a high style of living. The trial judge has wide discretion in the admission of evidence, and we will not reverse his decision absent an abuse of discretion. *United States v. Buishas*, 791 F.2d 1310, 1313 (7th Cir.1986); *United States v. Harris*, 761 F.2d 394, 398 (7th Cir.1985). Even if it may have been error to admit any particular item, the error would be harmless. The defendant's self-assessment, assuming it was true and correct, amply apprised the jury that he made a "good living as a lawyer."

■ A photograph of the defendant's house, a "lovely home in a country setting," was admitted without objection, and was stipulated to be his house. The defendant now argues that this photo was introduced solely to inflame the jury against him. The government weakly argues that the photo shows where the revenue agent called and left her card. Beyond that, however, the government also argues that the photo reflected on the defendant's standard of living and his motive for attempting to separate himself from the house by placing title in his wife's name, and then in trust. Again, the admissibility of the photograph is a matter of the trial court's discretion and absent a showing of abuse will not be disturbed on appeal. *United States v. Fleming*, 594 F.2d 598, 607 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979). We see no abuse and certainly no "plain" error which might, under Federal Rule of Criminal Procedure 52(b), cause a miscarriage of justice if not recognized. *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982).

■ The government also offered some summary chronological charts showing,

---

5. Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

during the relevant period, what the defendant was doing in relation to his taxes and financial activities. The defendant conceded that the charts were proper to use as aids to testimony, but objected to their admission in evidence. Federal Rule of Evidence 1006 permits the admission of summary charts not only in tax cases, but also in other cases, at the trial court's discretion. That exercise of discretion will be sustained absent "a clear showing of abuse and resulting prejudice" to the defendant. *United States v. Dana,* 457 F.2d 205, 207–08 (7th Cir.1972). Defendant's objection goes more to the admissibility of the underlying financial evidence which, as we have already demonstrated, was properly admissible. The charts were not attacked as inaccurate. *Needham v. White Laboratories, Inc.,* 639 F.2d 394, 403 (7th Cir.), *cert. denied,* 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 237 (1981). The charts aided the jury in understanding the evidence, which involved incidents and transactions occurring over a period of years. We find no abuse.

■ The defendant also objects to the admission of other summary charts and to the testimony of a revenue agent who created the charts. One of these other summary charts was a Deposit Analysis Summary Chart, which the revenue agent drew up after examining all the bank accounts with which the defendant had a connection, showing deposits and expenditures. The jury needed the chart's help in putting the evidence in perspective. The defendant objected to the chart, asserting that it was an impermissible attempt by the government to put its evidence twice before the jury.

The trial judge, in response to the objection, restricted the agent's testimony where it would be unnecessarily repetitive. There was no abuse of discretion.

■ The defendant also finds fault with the instructions. The defendant argues that the court's instruction on the lesser-included offense [6] of willful failure to pay taxes misled the jury, because it did not inform the jury that the failure to pay the tax must occur at the time or times required by law or regulations. 26 U.S.C. § 7203. Another instruction, however, informed the jury, in case the date had slipped their memories, that the defendant's taxes were "owed" on April 15. The instructions as a whole were adequate. The defendant did not object at trial to the instruction to which he now objects, and in context there is no plain error.

■ The defendant also objects to the fact that the court gave the Seventh Circuit's standard "joint venture" instruction [7] because, according to the defendant, there was no evidence to justify it. Some of the defendant's wife's activities connected with the transfer of the house out of trust to the children, and the defendant's son's signature on checks for his father, all shown in the evidence, were sufficient, for example, to permit the inference that the wife's and son's acts were willfully directed by the defendant to help accomplish his avoidance of his tax payments. If the jury believed that he orchestrated their acts, then the defendant's directions made him responsible for the acts of those who assisted him.

6. The trial judge gave the following instruction:
 To sustain the charge of the lesser offense of wilful failure to pay taxes, the government must prove the following propositions:
 First: The defendant owed taxes;
 Second: The defendant failed to pay those taxes; and
 Third: The defendant's failure to pay was wilful.
 If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
 If, on the other hand, you find from your consideration of all of the evidence that any

of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

7. The joint venture instruction provided as follows:
 Whatever a person is legally capable of doing he can do through another person by causing that person to perform the act. If the acts of another are willfully ordered, directed, or authorized by the defendant, he is responsible for such acts as though he personally committed them.

■ Lastly, the defendant objects to the trial court's instruction defining willfulness because it does not distinguish and exclude mere negligent conduct. The instruction is short and plain, and by its own words excludes all but willful conduct done voluntarily to avoid a legal duty. It thereby excludes negligent or accidental acts. It is a standard Seventh Circuit instruction in tax cases [8] which has been used and approved.[9] *United States v. Bressler*, 772 F.2d 287, 291 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986).

The jury was guided by proper instructions and its verdict that the defendant was guilty was supported with ample evidence.

AFFIRMED.

---

**8.** The instruction provided that
 [a]n act is done wilfully if done voluntarily and intentionally with the purpose of avoiding a known legal duty.

**9.** *See Federal Criminal Jury Instructions of the Seventh Circuit* 83 (1980).