UNITED STATES of America, Plaintiff–Appellee,

v.

Jack Leroy PETTY, Defendant–Appellant.

Nos. 96–3845 & 96–3846.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1997.

Decided Dec. 18, 1997.

 

Charles Goodloe, Jr. (argued), Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

Kerry C. Connor, Indianapolis, IN, Steven J. Riggs (argued), Indiana Federal Community Defenders, Inc., Indianapolis, IN, for Defendant–Appellant.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

A jury found Jack Petty guilty of aiding and abetting the tampering of a vehicle identification number ("VIN") in violation of 18 U.S.C. § 511(a). Petty pled guilty to two additional counts of dealing in stolen property in violation of 18 U.S.C. § 659. The district court sentenced him to 60 months imprisonment for the VIN charge and 87 months imprisonment for the stolen property charges, sentences to run concurrently. The court also imposed a fine of $60,000 ($20,000 per count). Petty appeals his conviction and sentence. We affirm.

## I. HISTORY

In February 1991, the Federal Bureau of Investigation began monitoring an Indiana theft ring, of which Jack Petty and his three sons were members. Undercover Agent William Wagoner and cooperating witness Freddy Cary posed as dealers in stolen goods and quickly established a relationship with members of the ring. During the early days of the investigation, Jack Petty's sons contacted Agent Wagoner and Cary. One of the sons, Daniel Petty, explained to Agent Wagoner and Cary how he had stolen two Chevrolet Astro vans from the Dunfee Chevrolet dealership in Columbus, Indiana. In order to make one of the vans appear legitimate, Daniel bought two similar minivans cheaply at a salvage auction for the purpose of switching their titles and VINs with those of one of the stolen Chevrolet Astro vans.

Daniel was arrested shortly thereafter. His brother, Russell Petty, had the second stolen van. After Daniel's arrest, Russell realized he should dispose of the second van quickly as suspicions were mounting. Members of the theft ring convened at Jack Pet-

ty's home. From Jack Petty's telephone (which telephone company records show registered to Lisa Horner, Jack's common law wife), Russell paged Agent Wagoner. After several telephone conversations, Agent Wagoner and witness Cary agreed to make the stolen van "disappear."

A few months later, the story repeated itself. The third Petty son, Mark, called Agent Wagoner attempting to find a new VIN and title for a Chevrolet truck stolen from a man named Ted Gray. After several calls between the two, Agent Wagoner told Mark he had located a title and VIN. As they began to discuss the price, Mark mentioned that he was actually buying the VIN and title for someone else; Mark did not name the person for whom he was making the purchases. A week later, Agent Wagoner delivered the VIN and a registration decal. He agreed with Mark to deliver the title sometime later, and Mark agreed to provide payment at that time.

On February 5, 1992, Agent Wagoner called Mark Petty to tell him the title was ready and to agree on a meeting place. Mark told Agent Wagoner he would contact the still unnamed buyer to get the money. Later that day, Mark called Agent Wagoner back and told him the buyer was ready to pay but had to have his taxes done early the next day, so the transaction could not be completed until later the next day. On the following day, Agent Wagoner called Mark again to try to arrange to complete the transaction, and Mark repeated that the buyer was busy having his taxes done. Finally at 3:20 p.m., the two spoke again. Mark told Agent Wagoner that he was meeting the buyer in Muncie, Indiana in half an hour, and Agent Wagoner should meet Mark in an hour. Telephone records show that Mark Petty was calling Jack Petty's home in Pennville, Indiana between conversations with Agent Wagoner.

At the time when Mark said he would be meeting the buyer, another undercover agent saw Mark meet with someone in a red Chevrolet Camaro bearing a license plate registered to Jack Petty. Shortly after meeting with the buyer, Mark paid Agent Wagoner $1,200 for the new title.

About a month later, Agent Wagoner, still in an undercover capacity, met with Jack Petty at his home. During the conversation, Jack said that the new VIN and title that Mark Petty had bought from Agent Wagoner were actually for himself, Jack.

More than a year later, the stolen truck was recovered at the Panama City, Florida International Airport. It bore the VIN that Agent Wagoner had given to Mark; however, a confidential VIN showed that the truck actually belonged to Ted Gray, who had reported it stolen long before. Jack Petty was arrested for dealing in stolen property and tampering with a VIN.

## II. ANALYSIS

Jack Petty makes six arguments before this Court: three challenging his conviction and three challenging his sentence. Regarding his conviction, first he argues that the prosecution presented insufficient evidence for any rational jury to find him guilty beyond a reasonable doubt of aiding and abetting the tampering with a VIN. Second, he argues that the district court improperly allowed an FBI technical analyst to explain to the jury how certain telephone company documents implicate him in the VIN tampering. Third, he argues that the district court erred in admitting hearsay statements of co-conspirators when the Government did not charge a conspiracy.

As to his sentencing, Petty argues first that the district court erred in finding a common scheme or plan under United States Sentencing Commission, *Guidelines Manual* ("U.S.S.G."), § 1B1.3 (Nov.1992). Second, he argues that the district court improperly applied U.S.S.G. § 5G1.2 to impose a sentence of 60 months on the VIN count. And finally, he argues that the court erred in imposing a $60,000 fine without inquiring into his ability to pay.

### A. *Insufficiency of the Evidence*

■ Petty argues that the prosecution produced evidence insufficient to allow a rational jury to find him guilty beyond a reasonable doubt of tampering with a VIN in

violation of 18 U.S.C. § 511(a).[1] The question this Court must ask itself is not whether we would have convicted the defendant, but whether *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). As such, Petty "follows in the footsteps of countless criminal defendants who have made similar arguments in this court, and, like them, he bears a heavy burden, and faces a nearly insurmountable hurdle." *United States v. Pribble,* 127 F.3d 583, 590 (7th Cir.1997) (citations and internal quotation marks omitted).

The indictment charged Jack Petty as follows:

> On or about January 15, 1992, in the Southern District of Indiana, Jack Leroy Petty ... with intent to further the theft of a motor vehicle, knowingly tampered with, removed and altered a decal which had been affixed to a motor vehicle pursuant to the Motor Vehicle Theft Prevention Act, to wit: a 1991 Chevrolet Pick Up Truck, with a vehicle identification number, the last four digits of which were (VIN3817), which was removed, obliterated, tampered with or altered, and a substitute identification number the last four digits of which were "7162" was affixed to the vehicle.
>
> The above stated offense was in violation of Title 18, United States Code, Section 511 and Section 2.

Indictment at 63, *United States v. Petty, No. 95109–16* (S.D.Ind. Sept. 14, 1995). The indictment fairly tracked the language of § 511(a)(2). The essential elements of the charge are; 1) intent to further the theft of a motor vehicle; 2) knowingly tampering with, removing, or altering a decal; 3) the decal affixed pursuant to the Motor Vehicle Theft Prevention Act.

■■■ Rather than making an amorphous argument that the Government failed to prove its case, Petty thankfully raises several more tailored points. First, he argues that the Government did not prove that he personally tampered with the VIN. Although this is an element of the offense, the Government may bypass establishing it through an aiding and abetting theory under 18 U.S.C. § 2. *See United States v. Gooch,* 120 F.3d 78, 80–81 (7th Cir.1997). When the Government charges that a defendant aided and abetted the commission of a crime, the Government must prove the essential elements of aiding and abetting: knowledge of the crime, intent to further the crime, and some act of help by the defendant. *See United States v. Draves,* 103 F.3d 1328, 1332 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997). In a sense, the essential elements of aiding and abetting serve as a substitute for the defendant's actual physical participation in the crime.

Here, the prosecution presented evidence that Mark and Jack had several phone conversations about the new VIN, title, and sticker. This evidence establishes Jack's knowledge, the first element of aiding and abetting. The prosecution also presented evidence that Jack Petty paid for the new VIN, title, and sticker. This evidence shows his intent to further the crime as well as an act of helping. From this base of support, a rational jury could find beyond a reasonable doubt that Petty aided and abetted the tampering with a VIN.

■■■ Second, Petty argues that the Government did not establish the identity of the principal whom he aided and abetted. Petty suggests that a necessary element of aiding and abetting is proof of whom exactly the defendant aided and abetted. We disagree. We have never required the Government even to identify the principal, much less prove it was that person whom the defendant aided and abetted. *See United States v. Somers,* 950 F.2d 1279, 1283 (7th Cir.1991). To

---

1. Section 511(a) reads:
 A person who-
 (1) knowingly removes, obliterates, tampers with, or alters an identification number for a motor vehicle or motor vehicle part; or
 (2) with intent to further the theft of a motor vehicle, knowingly removes, obliterates, tampers with, or alters a decal or device affixed to a motor vehicle pursuant to the Motor Vehicle Theft Prevention Act,
 shall be fined under this title, imprisoned not more than 5 years, or both.
 18 U.S.C. § 511(a).

require the prosecution to allege and prove whom a defendant aided and abetted would create an additional element that would discourage law enforcement officials from pursuing individuals for aiding and abetting others' crimes.

■ Third, Petty argues that the Government failed to prove that he intended to further the theft of a vehicle; specifically, he argues that the Government failed to prove that an actual theft occurred. However, before trial the parties stipulated that Ted Gray reported his Chevrolet truck stolen. Furthermore, the Government showed that Petty fraudulently purchased a new VIN, title, and sticker to disguise the very fact that the truck was stolen. The Government thus satisfied its burden of presenting evidence, and the jury was entitled to infer that someone stole Ted Gray's truck.

■ Fourth, Petty argues that the Government failed to prove that the owner of the truck did not alter the VIN. He points to the exceptions listed in 18 U.S.C. § 511 for scrap processors, vehicle demolishers, mechanics, the owner of the vehicle, and others who have legitimate reasons to alter VINs; under certain circumstances those listed will not be criminally liable for tampering with a VIN. *See* 18 U.S.C. § 511. Petty argues that the Government bore the burden of proving that one of those people did not alter the VIN instead of Petty or the person Petty aided and abetted.

■ Due process requires that the prosecution, not the defendant, bear the burden of proving every element of a criminal offense. *See In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). The Supreme Court has approved, however, statutory schemes that place the burden on a defendant to prove an affirmative defense. *See Patterson v. New York,* 432 U.S. 197, 200, 97 S.Ct. 2319, 2321–22, 53 L.Ed.2d 281 (1977); *Leland v. Oregon,* 343 U.S. 790, 799, 72 S.Ct. 1002, 1007–08, 96 L.Ed. 1302 (1952). An affirmative defense must be sharply distinguished from a simple "defense," or a simple negation of one of the elements of the offense, because the defendant never bears the burden of proof on the

elements of the offense. An affirmative defense goes beyond the elements of the offense to prove facts which somehow remove the defendant from the statutory threat of criminal liability.

Here, the exceptions for certain people contained in § 511 are affirmative defenses. A person such as a vehicle demolisher may be charged under § 511; nonetheless, such a person will not be liable if he or she successfully demonstrates status as a vehicle demolisher and satisfies the other conditions of the exception. Such a person need not try to disprove the elements of the offense. The affirmative defense lifts the defendant out of the statute.

We agree with the policies that put the burden on Petty here. We see no contribution to our system of justice in requiring the prosecution to prove that Petty is neither a scrap processor, nor a vehicle demolisher, nor a mechanic. To require the prosecution in every case to disprove exceptions would add immense time and expense to prosecutions without affording any additional protections to defendants. Defendants who want to raise such an affirmative defense are at liberty to do so; they merely bear the burden of producing evidence to demonstrate their exception.

Here the prosecution proved the elements of § 511. Petty could have tried to prove one of the exceptions; in doing so, however, he bore the burden of presenting evidence. Petty does not argue that the district court failed to instruct the jury on his affirmative defense; he argues that the prosecution failed to meet its burden on the exceptions. Since the prosecution bore no such burden, we find no error in the district court's actions.

### B. The FBI Analyst's Testimony

■ At trial, the prosecution submitted computer-generated telephone bills in order to show that when Mark Petty told Agent Wagoner he was calling "him" (the purchaser of the fraudulent VIN, title, and decal), Mark was actually calling Jack Petty. These computer-generated records were cumbersome, difficult to read, and contained much irrelevant information. Thus, the prosecution

asked FBI Technical Analyst Marjorie Rachow to prepare charts which showed the times of the relevant telephone calls and the telephone numbers from which they were placed. She did so.

██ The prosecution offered her charts into evidence under Fed.R.Evid. 1006 ("Rule 1006") as summary evidence. The district court declined to allow the evidence. However, the court did allow Rachow to testify about the charts and to use them as demonstrative aids. The court allowed her testimony under Fed.R.Evid. 611(a) ("Rule 611(a)"), which provides:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Petty argues that Rachow's testimony was inappropriate because she merely "vouched" for the Government's case, usurping the role of the jury as fact finder. We review the court's decision to admit the testimony for abuse of discretion. *See United States v. Bentley,* 825 F.2d 1104, 1108 (7th Cir.1987).

██ Although the district court did not admit Rachow's charts into evidence, under Rule 1006 it was within the district court's discretion to do so. Rule 1006 provides that, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed.R.Evid. 1006. The charts fit squarely within the Rule. *See United States v. Conley,* 826 F.2d 551, 559–60 (7th Cir.1987) (Court below properly admitted summaries showing defendant's tax liability.); *Bentley,* 825 F.2d at 1108 (Court below properly admitted charts summarizing defendant's net position in silver and copper futures.). They summarized telephone records already in evidence-records which were quite unwieldy and more complex than a consumer's monthly telephone statement. The district court noted that the charts accurately represented materials already in evidence, but for reasons unapparent to us the district

court declined to accept the summaries into evidence.

The court's decision does not trouble us, however. The court exercised its discretion under Rule 611(a) to control the "mode and order" of presenting evidence, here requiring the Government to present its evidence orally rather than in written form. The practical effect of the court's decision is that no papers followed the jury into their deliberations. Arguably this is helpful to a defendant. Sending the Government's paper evidence into the jury room can reinforce its harmful effect on the defendant's case, while admitting only testimony forces the jury to recall the evidence on its own.

Since the court could have admitted the charts, it did not abuse its discretion in allowing Rachow to testify as to their contents under Rule 611(a). *Cf. United States v. Li,* 55 F.3d 325, 329 (7th Cir.1995) (expanding Rule 611(a) to include the rule of completeness for oral statements).

### C. Admission of Co–Conspirators' Statements

██ Before trial, the district court held a hearing on the Government's motion in limine to admit statements of coconspirators. The court had to determine whether Jack Petty had been involved in a conspiracy (even though the Government charged no conspiracy); and if so, whether various statements made by conspiracy members were made in furtherance of the conspiracy and thus excluded from hearsay under Fed. R.Evid. 801(d)(2)(E). The court concluded that a conspiracy did indeed exist, and it admitted numerous statements into evidence. Petty challenges the determination that he was involved in a conspiracy; he does not challenge any particular statements. Therefore, we do not address whether any particular statements were made in furtherance of the conspiracy; we only examine whether the district court properly found that a conspiracy existed by a preponderance of the evidence, *see Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). We review the district court's determination for clear error. *See*

*United States v. Godinez*, 110 F.3d 448, 454 (7th Cir.1997).

■■ The core of Petty's argument is that hearsay statements of the conspirators alone cannot establish the existence of the conspiracy. Petty has correctly stated the law. While hearsay may support the existence of a conspiracy in part, *see Bourjaily*, 483 U.S. at 178, 107 S.Ct. at 2780, we require more than the statements of the conspirators themselves to show a conspiracy, *see United States v. Lindemann*, 85 F.3d 1232, 1239 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996). This requirement can be satisfied by the testimony of nonconspirators or by corroboration of facts contained in the statements of the conspirators. *See id.*

In this case, the district court relied on more than the statements of the co-conspirators. In addition to the testimony of Agent Wagoner, which included his recollection of the statements of the co-conspirators, the Government produced evidence that corroborated the statements of the coconspirators. For example, Agent Wagoner testified to the following events: Russell Petty told Freddy Cary about a scheme he hatched with Jack Petty and Neil Keggereis. The plan was to make it look like Keggereis' van was being stolen. As Russell described it, Jack and Russell accompanied Keggereis to the "theft" site so Keggereis could have a ride home after the "theft." Russell also told Cary that Keggereis was planning to call the police one hour after the "theft" to make a report. The Government corroborated Russell's statement by introducing a Bluffton, Indiana police report, filed by Neil Keggereis, complaining of a stolen van. Indeed, a later search of Jack Petty's property revealed the engine of that van and part of its body.

In addition, Agent Wagoner testified that Daniel Petty offered to sell him a stolen boat which Jack Petty was storing on Jack's property—this was more evidence that Jack conspired with others to deal in stolen goods. Agent Wagoner agreed to buy the boat. The statement that the stolen boat was on Jack's property was corroborated by the fact that some days later, Agent Wagoner and Daniel drove together to Jack Petty's property, and the boat was indeed there.

Certainly the hearsay statements from Agent Wagoner adhered various facts to one another, but the hearsay was adequately corroborated by other evidence. We find no clear error in the district court's determination that a conspiracy existed.

### D. Relevant Conduct

■■■ The district court found that the activities of the Petty theft ring amounted to a "common scheme or plan" under U.S.S.G. § 1B1.3.[2] Petty makes several arguments concerning this finding; we address the two that are most fully developed in his brief. First, he argues that because various activities attributed to the common scheme or plan could have been separately charged, it is not appropriate to consider them as relevant conduct for sentencing. And second, he argues that the court failed to articulate its findings regarding a common scheme or plan. We review the district court's factual determinations for clear error, but its interpretations of the Sentencing Guidelines *de novo*. *See United States v. Taylor*, 72 F.3d 533, 542 (7th Cir.1995).

Section 1B1.3 enables a district court to sentence a defendant in light of the sum of his or her deeds. It directs the district court to consider "all acts and omissions described ... above that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). The operative phrase is "all acts and omissions," which makes no reference to charges or indictments. "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, comment. (n.9).

---

**2.** The district court sentenced Petty under the November 1992 Sentencing Guidelines after determining that his sentence would be harsher under the November 1995 Sentencing Guidelines, and therefore would violate the *Ex Post Facto Clause*. We see no reason to disturb this determination.

Petty appears to have missed the point of U.S.S.G. § 1B1.3(a)(2) regarding common scheme or plan. The commentary to that section provides:

[T]he applicability of subsection (a)(2) does not depend upon whether multiple counts are alleged.... [O]ffenses of the character dealt with in subsection (a)(2) ... often involve a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing.... Another consideration is that in a pattern of small thefts, for example, it is important to take into account the full range of related conduct. Relying on the entire range of conduct, regardless of the number of counts that are alleged or on which a conviction is obtained, appears to be the most reasonable approach to. writing workable guidelines for these offenses.

U.S.S.G. § 1B1.3, comment. (backg'd.).

To the extent Petty argues that relevant conduct is only conduct that for some reason could not have been separately charged, perhaps because it was not illegal, he is simply incorrect. The Sentencing Guidelines specifically contemplate, indeed require, that the district courts take into account "the full range of related conduct," whether it be charged or not. *Id.*; *see also United States v. Crockett*, 82 F.3d 722, 730 (7th Cir.1996) (taking into account uncharged drug transactions); *Taylor*, 72 F.3d at 541 (same).

Petty's argument is more a challenge to the policies underlying the Sentencing Guidelines than to the district court's interpretation of the Guidelines. The Sentencing Commission decided in the formative stages of the Guidelines to design a system that "does contain a significant number of real offense elements," U.S.S.G. Ch. 1, Pt. A 4(a), p.s., meaning that the sentencing court examines the entirety of events surrounding the offense and not merely the facts alleged and proved at trial. Petty's argument is with the Sentencing Commission, not with the district court. We find no clear error here.

■ Petty also argues that the district court failed to articulate its findings sufficiently. Petty is not satisfied with the court's finding of a "common scheme or plan"

under § 1B1.3(a)(2). The district court specifically found three common factors: common accomplices in the Petty family members, Neil Keggereis, and others; common purpose of financial gain; and similar *modus operandi* in stealing and reselling merchandise with Jack Petty consistently acting as the fence. As any one factor would have been sufficient for a common scheme or plan, we find no clear error.

*E. Improper Sentencing of VIN Count*

■ Petty's next sentencing argument is that the district court improperly interpreted § 5G1.2(c). We find some confusion in the record over the sentencing on the VIN count. Petty argues that the district court improperly applied § 5G1.2(d) to arrive at a sentence of 60 months instead of 41 to 51 months for the VIN count. Meanwhile, the Government argues that the district court properly applied § 5G1.2(b) & (c) to arrive at 60 months. Our review of the record shows that the district court did neither; the parties have misconceived the issue. We review the district court's factual determinations for clear error, but its interpretations of the Sentencing Guidelines *de novo*. *See Taylor*, 72 F.3d at 542.

Contrary to the parties' assertions, the issue is one of grouping, not of the application of § 5G1.2. The district court grouped the VIN count with the stolen property counts under U.S.S.G. § 3D1.2. The Guidelines require that district courts combine offenses into one group for sentencing when the offenses share some common characteristic, such as the same victim or a common scheme or plan. U.S.S.G. § 3D1.2(a), (b). The Guidelines also require grouping when the "offense level is determined largely on the basis of the total amount of harm or loss." U.S.S.G. § 3D1.2(d).

The Guidelines specify which offenses normally form a group: violations of 18 U.S.C. § 511 (sentenced under U.S.S.G. § 2B6.1) and 18 U.S.C. § 659 (sentenced under § 2B1.1) are normally grouped. *See* U.S.S.G. § 3D1.2. The effect of grouping is that the higher offense level becomes the combined adjusted offense level for *both*

crimes. *See* U.S.S.G. § 3D1.3(a). In this case, the VIN count originally had an adjusted offense level of 20, while the stolen property counts had an adjusted offense level of 25. After grouping, the combined adjusted offense level is the higher of the two, here 25. The sentencing range for this adjusted offense level in Criminal History Category III is '70–87 months. However, the statutory maximum sentence for tampering with a VIN is 60 months. *See* 18 U.S.C. § 511. U.S.S.G. § 5G1.1(a) directs the district court to use the statutory maximum as the sentence rather than the guideline recommendation when the statutory maximum is less than the guideline recommendation. Thus, the court correctly applied § 5G1.1(a) to sentence Petty to the statutory maximum rather than the guideline sentence. We find no clear error here.

### F. The $60,000 Fine

 Petty argues that the district court failed to make proper findings, as required by U.S.S.G. § 5E1.2(d)[3], before imposing a $60,000 fine. Particularly, Petty argues that the court failed to consider that his net worth is no more than $57,000 and that he contributes support to two grandchildren. Again, we review the district court's factual determinations for clear error, but its interpretations of the Sentencing Guidelines *de novo*. *See Taylor*, 72 F.3d at 542.

The Probation Officer's Presentence Investigation Report ("PSR") listed Petty's net worth as $53,100 and his net monthly income as $70. It also noted that Petty contributes approximately $1,000 annually to the raising of his granddaughter and his common law wife's son. The Probation Officer recommended a fine of $20,000 per count, or $60,-

000, payable immediately, beginning with the Inmate Financial Assistance Program. The Probation Officer further recommended that the court assess the fine without interest because Petty lacked the resources to pay interest.

The district court adopted the findings in the PSR; however, despite the Probation Officer's recommendation otherwise, the court imposed interest on the fine. The district court explained its actions in ruling that "[d]efendant's request that interest be waived is overruled given that Mr. Petty is the recipient of a monthly pension check [in the amount of $1700]." Entry Addressing Sentencing Issues, *United States v. Petty*, No. 95109 & 95–149, at 103 (S.D.Ind. Feb. 3, 1997). The district court did not elaborate further on the fine or Petty's financial situation.

Our recent opinion in *United States v. Bauer*, 129 F.3d 962 (7th Cir.1997) guides our analysis. In that case, like here, the defendant challenged the fine not because he lacked all ability to pay any fine but because the district court failed to make express findings regarding his financial situation and other factors listed in U.S.S.G. § 5E1.2(d). *See Bauer*, 129 F.3d 962, 964–65. We held "that the rule in this circuit is that express or specific findings regarding each of the relevant factors to be considered before imposing a fine are not required," *id.* at 965, because the Guideline only requires that the district court "shall consider" the factors, *id.* We desired to relieve the district courts, when possible, from the substantial burden of making express findings when simply adopting the PSR will do as well.

---

**3.** U.S.S.G. § 5E1.2(d) provides:

In determining the amount of the fine, the court shall consider:
(1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
(2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
(4) any restitution or reparation that the defendant has made or is obligated to make;
(5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
(6) whether the defendant previously has been fined for a similar offense; and
(7) any other pertinent equitable considerations.
U.S.S.G. § 5E1.2(d).

However, we did not foreclose all review in this area. We noted that "[w]e will remand the imposition of a fine ... when the district court adopts the factual findings contained in the presentence report but deviates from the fine recommendation, if any, made by the United States Probation Office." *Id.* at 968; *see also United States v. Monem,* 104 F.3d 905, 912 (7th Cir.1997); *United States v. Vargas,* 16 F.3d 155, 159 (7th Cir.1994). In this case, the district court deviated slightly from the Probation Officer's recommendation by imposing interest on the fine after the Probation Officer found that Petty lacked the ability to pay interest. The district court articulated a reason for its deviation—Petty receives a monthly pension check from his former employment with General Motors. We require no more than this explanation for the deviation. That comment, taken together with the district court's otherwise wholesale adoption of the PSR, satisfies us that the district court gave "appropriate consideration" to the factors listed in U.S.S.G. § 5E1.2(d).

Our role in this appeal is not to resentence the defendant, nor to require the district court to impose the sentence we would have imposed. Rather, our role is to examine the district court's actions for indications that the district court gave proper deliberation to the factors that Congress and the Sentencing Commission have laid down. Finding that the district court acted properly, we affirm the imposition of the fine.

For the aforementioned reasons, Petty's conviction and sentence are AFFIRMED.